The **DUPLAN CORPORATION,**
Plaintiff,

v.

**DEERING MILLIKEN, INC., et al.,**
Defendants.

**DEERING MILLIKEN RESEARCH COR-
PORATION, Plaintiff,**

v.

The **DUPLAN CORPORATION** and Bur-
lington Industries, Inc., Defendants.

The **DUPLAN CORPORATION** et al.,
Plaintiffs on the Counterclaim,

v.

**DEERING MILLIKEN RESEARCH COR-
PORATION, Defendant on the
Counterclaim,**

and

Deering Milliken, Inc., et al., Additional
Defendants on Counterclaim.

Civ. A. Nos. 71–306, 70–968, 69–1096, 68–
704, 69–777, 70–14, 70–189, 70–250, 70–295,
70–358, 70–385, 70–386, 70–391, 70–493,
70–622, 70–628, 70–677, 70–683, 71–87 to
71–102, 71–115, 71–126, 71–127 and 71–
283.

United States District Court,
D. South Carolina,
Spartanburg Division.

Nov. 20, 1973.

See also, D.C., 370 F.Supp. 769, 334
F.Supp. 703, 353 F.Supp. 826, affirmed,
4 Cir., 487 F.2d 459, cert. denied, ——
U.S. ——, 94 S.Ct. ——, 39 L.Ed.2d ——,
61 F.R.D. 127, reversed, 487 F.2d 480.

Fletcher C. Mann, Leatherwood, Walker, Todd & Mann, Greenville, S. C., Charles B. Park, III, Parrott, Bell, Seltzer, Park & Gibson, Charlotte, N. C., Anthony F. Phillips, Willkie, Farr &

Gallagher, New York City, for United Merchants & Mfg. Inc., The Duplan Corp., The Schwarzenbach-Huber Co., Jonathan Logan, Inc., Frank Ix & Sons Va., Corp., Lawrence Texturing Corp. Burkyarns, Inc.

Edward P. Perrin, Perrin, Perrin & Mann, Spartanburg, S. C., David Rabin, McNeill Smith, Smith, Moore, Smith, Schell & Hunter, Greensboro, N. C., for Texfi Industries, Inc., Blanchard Yarn Co., Reliable Silk Dyeing Co., Dixie Yarns, Inc., Tex-Elastic Corp., Hemmerich Industries, Spring-Tex, Inc., Olympia Mills, Textured Fibres, Virginia Mills, Inc., Throwing Corp. of America.

Thomas A. Evins, Butler, Means, Evins & Browne, Spartanburg, S. C., Jay Greenfield, Simon H. Rifkind and David J. Brody of Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Deering Milliken, Inc., and Deering Milliken Research Corp.

Rufus M. Ward, Ward, Howell & Barnes Spartanburg, S. C., Granville M. Brumbaugh of Brumbaugh, Graves, Donohue & Raymond, New York City, for Moulinage et Retorderie de Chavanoz, Ateliers Roannais de Constructions Textiles, (ARCT, France).

R. Hoke Robinson, Thomas T. Moore, Robinson, McFadden & Moore, Arthur O. Cooke, Cooke & Cooke, Greensboro, N. C., for ARCT, Inc.

W. Francis Marion, O. G. Calhoun, Haynsworth, Perry, Bryant, Marion & Johnstone, Greenville, S. C., John W. Malley, Wm. K. West, Jr., of Cushman, Darby & Cushman, Washington, D. C., for Burlington Industries, Inc., Madison Throwing Co., Inc., Leon-Ferenbach, Inc., National Spinning Co., Inc.

---

1. As consolidated, this case involves claimed anti-trust and patent issues. Originally confronted with the enormity of the litigation, estimated to be ten years in concluding (four years have elapsed since the original litigation was filed), encompassing issues as to more than 100 claims on 21 patents (Exhibit No. 153), this court separated, for purposes of discovery and management, the issues into Phase I and Phase II by its Pretrial Order No. 1 of 11 November 1971. Phase I comprises anti-trust and patent misuse issues; Phase II involves patent validity and infringement issues.

## ORDER

ON MOTION BY BURLINGTON INDUSTRIES, INC., FOR SUMMARY JUDGMENT THAT U.S. PATENT NO. 3,117,361 IS NOT INFRINGED BY USE OF ARCT FT MACHINES

HEMPHILL, District Judge.

Burlington Industries, Inc. (hereinafter called Burlington) moves the court for summary judgment that U. S. Patent No. 3,117,361 is not infringed by use of "false twist" (hereinafter designated FT) machines, manufactured by Ateliers Roannais de Constructions Textiles (hereinafter called ARCT–France) and sold by ARCT, Inc., of Greensboro, N.C., a U. S. subsidiary of ARCT–France. The motion is similar to, and a companion of, Burlington's Renewed Motion for Summary Judgment as to U. S. Patent No. 2,741,893. This court's findings and conclusions as to that motion were filed November 14, 1973. Contained therein is a brief but general history and background of this entire controversy, together with this court's recognition of the applicable law. To avoid repetition, reference to the court's order of November 14, 1973, is respectfully invited.

### ADDITIONAL PAST HISTORY OF THIS LITIGATION

On January 17, 1973, this court entered its order granting movant's motion of non-infringement as to Phase I[1] of this litigation. Except for the testimony of one witness (whose illness prevented completion) Phase II discovery is complete, and it is appropriate that this court rule on this motion to expedite further processing of this litigation.

The patent under scrutiny, attached as an appendix of this order, guarantees a patent monopoly on a heat treating machine (hereinafter called the heater), as applied to synthetic (non-man-made) fibres, having two distinct segments or zones in successive portions of a heater tube, each segment being separately heated by the passage of current through a portion of the tube and by a heating coil, respectively. The patented invention is called a "bilobal" heater because the cross-section has two lobes shaped like a barbell lifting weight. Identical construction is not present in the accused heaters in which the whole length of the tube is heated by passage of current through it, and essentially the whole length of the tube also is heated by the coil.

Contentions with respect to this patent allege direct infringement[2] under the doctrine of equivalents of claims 1 and 2 of the patent by Burlington and others (hereinafter the Throwsters) by use of FT–411 (FT–400) and those FT–3 and FTF machines (hereinafter designated as the accused devices) having a heating tube heated by the passage of current through the tube, and by an electrical coil wherein the two heating means are independently regulatable.

The claims which the patent owner alleged to be infringed are as follows:[3]

1. Yarn heat treating apparatus comprising an electrical resistance tube; *a first terminal* for electrical energy being *connected to said tube at a location intermediate the entrance and exit ends of said tube; another terminal* for electrical energy being *connected to said tube* at a location *at the exit end of said tube,* the portion of the tube defined by said terminals defining a compensating heating zone wherein yarn passed through the tube is treated at a temperature level approximating the desired temperature level for yarn treatment; a low thermal inertia electrical resistance *heating coil surrounding the tube between the inlet end of the tube and said first terminal* located intermediate the inlet and outlet ends of the tube, said heating coil having a heating input capable of effecting a temperature very substantially higher than the desired temperature level for yarn treatment in the compensating heating zone in order that rapid temperature changes may be effected, but controlled to a level below said desired temperature level for yarn treatment; said heating coil and the compensating heating zone being *independently* and individually temperature regulated.

2. The yarn heat treating apparatus of claim 1 wherein the electrical resistance tube is a contact heater.[4]

Conversely, the Throwsters contend that a file wrapper estoppel exists. They claim that the plain meaning of the claims of the patent precludes the interpretation for which the patent owner (hereinafter designated for convenience of reference as Plaintiff) contends, and that the Plaintiff's equivalency argument is inconsistent (1) with concessions which the applicant made to the Patent Office in obtaining the patent, and (2) with the interpretation of the invention in the specification of the

---

2. [W]hoever without authority makes, *uses*, or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent. (Emphasis added to indicate type of direct infringement involved in this motion). 35 U.S.C. § 271(a) (1952).

3. The particularly significant words in the claims which will be discussed later, are underlined.

4. Claim 2 is a dependent claim and therefore includes all of the features of independent claim 1. Thus, 35 U.S.C. § 112 (second paragraph) (1965) provides:

A claim may be written in independent or dependent form, and if in dependent form, it shall be construed to include all the limitations of the claim incorporated by reference into the dependent claim.

patent and its drawings. On this basis, they urge that the accused heaters simply are not equivalents of the patented invention.

## THE MOTION

Acting on their belief in the strength of their position, the Throwsters have moved for summary judgment of non-infringement. The motion is based on the following facts about which there is no dispute: the patent itself (Exhibit No. 153); the file wrapper history of the patent (Exhibit No. 950); and two physical exhibits, i. e., the heaters allegedly covered by the patents (Exhibits Nos. 967 and 993). Summary judgment of non-infringement may be appropriate in such circumstances if no genuine issue of fact exists. As stated in this court's earlier order of November 14, 1973, and restated here for purpose of emphasis, it appears to this court that a motion for summary judgment of direct infringement or non-infringement may be granted in a patent case in any one of the four following situations provided there is no genuine issue of fact to be resolved: first, where there is a file wrapper estoppel as to the patent owner's interpretation of the meaning of terms of art used in the claims, thus removing the accused device as a literal direct infringement; second, where no file wrapper estoppel exists and where there is no contest as to the meaning of terms of art but the accused device reads literally on the patent claims; third, where the file wrapper estops the patent owner from asserting a charge of direct infringement under the doctrine of equivalents against the accused device; and fourth, if there is no such file wrapper estoppel, where the doctrine of equivalents can be applied by the court without the aid of extrinsic evidence.

Since the Plaintiff admits that there is no direct infringement by the accused devices by a literal reading on the patent claims, neither the first nor the second situation applies. The Throwsters'

motion proposes that either the third or fourth situation is presented here because either the file wrapper estops the Plaintiff from asserting a charge of direct infringement under the doctrine of equivalents against the accused devices, or, if there is no file wrapper estoppel, the doctrine of equivalents can be applied by this court without the aid of extrinsic evidence. The Plaintiff opposes this motion because it contends that genuine issues of fact exist which preclude a motion for summary judgment.

The court agrees with Plaintiff's position. The court has made a searching examination of the file wrapper and finds that the applicant at no time claimed, during the course of the prosecution of the patent application in the Patent Office, an invention which encompassed the accused devices and later disclaimed or abandoned claims covering such accused devices. Therefore, the file wrapper does not estop the Plaintiff from asserting the doctrine of equivalents against the accused devices. The doctrine of equivalents can be applied by a court without the aid of extrinsic evidence, if there is no genuine issue of fact existing. Such is not the case here because genuine questions of fact exist. The determination of whether the accused devices are equivalents of the patented invention is a question of fact. Coupe v. Royer, 155 U.S. 565, 579–580, 15 S.Ct. 199, 39 L.Ed. 263, 268 (1895). In Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 609, 70 S.Ct. 854, 857, 94 L.Ed. 1097, 1103 (1950), the Supreme Court said:

A finding of equivalence is a determination of fact. Proof can be made in any form: through testimony of experts or others versed in the technology; by documents, including texts and treatises; and, of course, by the disclosures of the prior art.

The court finds that genuine issues of fact exist in this case which make it necessary that the court resort to extrin-

sic evidence in the form of testimony from those persons ordinarily skilled in the pertinent art (1) to explain terms of art, (2) for evaluation of prior art, and (3) to resolve questions of the application of descriptions to the accused devices. Unlike the court in Rubinstein v. Silex Co., 73 F.Supp. 336 (S.D.N.Y. 1947), which made such a determination, this court is unable at this time to resolve alone the question of equivalency or non-equivalency from a comparison of the accused devices with the patent claims. Plaintiffs have asked for a jury trial on patent issues (Phase II) and where there are unresolved questions of fact on the issues of infringement and validity, such as posed here, the court should not deny that right. In Pierce v. Ford Motor Co., 190 F.2d 910, 915 (4th Cir. 1951), cert. den., 342 U.S. 887, 72 S.Ct. 178, 96 L.Ed. 666, the court said:

> From what we have said, it is clear that there were issues in the cases for a jury to decide, and it was error to enter summary judgments for defendant for that reason. It is only where it is perfectly clear that there are no issues in the case that a summary judgment is proper. Even in cases where the judge is of opinion that he will have to direct a verdict for one party or the other on the issues that have been raised, he should ordinarily hear the evidence and direct the verdict rather than attempt to try the case in advance on a motion for summary judgment, which was never intended to enable parties to evade jury trials or have the judge weigh evidence in advance of its being presented.

### FINDINGS OF FACT AS TO FILE WRAPPER ESTOPPEL

1. U. S. Patent No. 3,117,361 was granted by the Patent Office on January 14, 1964, based on U. S. application serial No. 8,046 filed on February 11, 1960. It relates to a yarn heat treatment apparatus which heats yarn as it passes through a heater tube.

2. Prior to the grant of said patent, the Examiner on two separate occasions rejected claims, viz., June 27, 1961 and November 14, 1962 (Exhibit No. 950, [the file wrapper] pages 18–19 and 30–31).

3. The application was originally presented to the Examiner with 14 claims, the text of which is as follows (Exhibit No. 950, pages 8 to 10):

1. Yarn heat treating apparatus comprising yarn heating means for preheating a running length of yarn to a first temperature level, and compensating heating means closely adjacent said preheating means for bringing said yarn temperature to a second desired temperature level, said second temperature level being the desired yarn treatment temperature.

2. Apparatus according to Claim 1 wherein at least one of said heating means is a contact heater.

3. Apparatus according to Claim 1 wherein the energy required to be supplied by said preheating means is greater than the energy required to be supplied by said compensating heating means.

4. Apparatus according to Claim 1 where said preheating means and said compensating heating means are individually temperature regulated.

5. Apparatus according to Claim 1 wherein said preheating means has a heating input capable of effecting a temperature very substantially higher than said first temperature level in order to effect a rapid temperature change.

6. Apparatus according to Claim 1 wherein said preheating means comprises a low thermal inertia heating coil.

7. Apparatus according to Claim 6 wherein said compensating means comprises said heating tube.

8. Apparatus according to Claim 7 wherein said heater coil surrounds the entrance end of said tube.

9. Apparatus according to Claim 8 wherein said heater coil and tube are electrical resistance heating elements.

10. Apparatus according to Claim 8 wherein said tube has electrical leads connected thereto, the tube connections for said leads being spaced along the length of said tube in linearly spaced apart relation (sic) from said coil.

11. The method of thermally treating thermoplastic yarn comprising preheating a thermoplastic yarn to a first temperature level above ambient room temperature and below the desired yarn treating temperature, and then supplying further energy to said yarn to raise it to a second desired temperature level at which it is desired to treat said yarn.

12. The method according to Claim 11 wherein the substantially greater energy supplied to raise the temperature of the yarn to said first level then is supplied to raise the temperature of the yarn to said second level.

13. The method according to Claim 11 including supplying said further energy in immediate flow relation after raising the temperature of the yarn to said first temperature level.

14. The method according to Claim 11 including independently regulating the supplying of energy to effect the raising of the temperature to said first level and to said second level respectively.

4. These 14 original claims were rejected by the Examiner on June 27, 1961 (Exhibit No. 950, pages 18–19).

5. On December 22, 1961, the applicant presented an amendment cancelling the aforesaid original claims and substituting claims 15–22, the text of which was as follows (Exhibit No. 950, pages 21–24):

15. Yarn heat treating apparatus comprising an electrical resistance tube; yarn preheating means for preheating a running length of yarn to a first temperature level within said tube, and compensating heating means closely adjacent said preheating means for bringing said yarn temperature to a second desired temperature level within said tube, said second temperature level being the desired yarn treatment temperature; said preheating means having a heating input capable of effecting a temperature very substantially higher than said first temperature level in order to effect a rapid temperature change and comprising a low thermal inertia heating coil surrounding the tube from the entrance end of said tube to a location intermediate the entrance and exit ends thereof; the compensating heating means being defined by input and outlet electrical terminals connected to said tube, one of said terminals being located closely adjacent to the heating coil, the other being located at a linearly spaced location toward the exit end of said tube.

16. The yarn heat treating apparatus of Claim 15 wherein at least one of the heating means is a contact heater.

17. Yarn heat treating apparatus comprising an electrical resistance tube, said tube being divided into a preheating zone and a compensating zone; the preheating zone being defined by a low thermal inertia electrical resistance heater coil completely surrounding the tube at the entrance end thereof, a source of electrical energy being connected to said heater coil at the respective ends thereof; the compensating zone being defined by two electrical leads connected to the tube, the first of said leads being connected to the tube at a location imme-

diately adjacent to the heater coil, the other electrical lead being connected to the tube near the outlet end thereof; said heater coil and said compensating zone being individually temperature regulated, the heater coil having a heating input capable of effecting a temperature very substantially higher than the temperature in the compensating zone in order to effect a rapid temperature change.

18. The yarn heat treating apparatus of Claim 17 wherein at least one of said preheating and compensating zones is defined by a contact heater.

19. Yarn heat treating apparatus comprising an electrical resistance tube, said tube being divided into a compensating zone located at the exit end of said tube and a preheating zone which embodies the remaining portion of said tube at the entrance end thereof; the preheating zone being defined by a low thermal inertia heating coil for preheating running lengths of yarn to a first temperature level; the compensating heating zone being defined by compensating heating means for bringing said yarn temperature to a second desired temperature level, said second temperature level being the desired yarn treatment temperature; said compensating heating zone being defined by electrical leads connected to said tube, the first of said leads being connected to the tube at a location immediately adjacent to said heating coil; said heating coil and compensating heating means being individually temperature regulated, the heating coil having a heating input capable of effecting temperatures very substantially higher than said first temperature level in order to effect a rapid temperature change.

20. The yarn heat treating apparatus of claim 19 wherein a contact heater is substituted for the electrical resistance tube and divided into preheating and compensating zones.

21. Yarn heat treating apparatus comprising an electrical resistance tube; a first terminal for electrical energy being connected to said tube at a location intermediate the entrance and exit ends of said tube; another terminal for electrical energy being connected to said tube at a location at the exit end of said tube, the portion of the tube defined by said terminals defining a compensating heating zone wherein yarn passed through the tube is treated at a temperature level approximating the desired temperature level for yarn treatment; a low thermal inertia electrical resistance heating coil surrounding the tube between the inlet end of the tube and said first terminal located intermediate the inlet and outlet ends of the tube, said heating coil having a heating input capable of effecting a temperature very substantially higher than the desired temperature level for yarn treatment in the compensating heating zone in order that rapid temperature changes may be effected, but controlled to a level below said desired temperature level for yarn treatment; said heating coil and the compensating heating zone being independently and individually temperature regulated.

22. The yarn heat treating apparatus of Claim 21 wherein the electrical resistance tube is a contact heater.

6. At the same time as presenting claims 15–22, the applicant's attorney gave the following explanation to the Examiner (Exhibit No. 950, page 28):

Claims 6–10 were rejected as unpatentable over the Belgian patent or Wedler in view of Stoddard et al. who disclose the use of heating coils completely surrounding the *entire length* of a continuous tube. Neither of the primary references so much as remotely suggest the use of a continuous tube of any type. Consequently, the combination of these references with Stoddard et al. is unwarranted in view of the respective disclosures thereof.

Clearly there is no suggestion in the Stoddard et al. patent, even if these references are combined, *that the heating coil should surround only the entrance end of the tube, as is recited in the present claims, or that the remaining portion of the tube should be connected to a source of electrical energy, thereby providing a second heating zone.* (Emphasis added).

7. Claims 15–20 were rejected by the Examiner on November 14, 1962; at the same time he allowed claims 21 and 22 (Exhibit No. 950, pages 30–31).

8. On May 6, 1963, the applicant presented an amendment cancelling rejected claims 15–20 (Exhibit No. 950, pages 32–33).

9. The allowed claims 21 and 22 were renumbered and are now claims 1 and 2 of U.S. Patent No. 3,117,361.

10. The allowed claims 21 and 22 both explicitly recite that the claimed heater tube has "a first terminal for electrical energy being connected to said tube at a location intermediate the entrance and exit ends of said tube".

11. None of the aforesaid cancelled claims recited that the claimed heater tube had " a first terminal for electrical energy being connected to said tube at a location intermediate the entrance and exit ends of said tube".

12. The allowed claims 21 and 22 both explicitly recited that the patented heater had an "electrical resistance heating coil surrounding the tube between the inlet end of the tube and said first terminal located intermediate the inlet and outlet ends of the tube".

13. None of the aforesaid cancelled claims recited that the patented heater had an "electrical resistance heating coil surrounding the tube between the inlet end of the tube and said first terminal located intermediate the inlet and outlet ends of the tube", although claims 8–10 of the rejected original application required that the "heater coil surrounds the entrance end of said tube".

14. The heater tubes which have been accused of infringing U.S. Patent No. 3,117,361 do not have "a first terminal for electrical energy being connected to said tube at a location *intermediate the entrance and exit ends* of said tube". (Emphasis added). Instead, the accused devices have a first terminal for electrical energy being connected to said tube at a location *at the entrance end* of said tube.

15. The heater tubes which have been accused of infringing U.S. Patent No. 3,117,361 do not have an "electrical resistance heating coil surrounding the tube *between the inlet end of the tube and said first terminal located intermediate the inlet and outlet ends of the tube*". (Emphasis added). Instead, the accused devices have an electrical resistance heating coil surrounding the tube *between said first terminal located at the inlet end of the tube and the other terminal located at the outlet end of the tube.*

## ANALYSIS

### DOCTRINE OF FILE WRAPPER ESTOPPEL

█ In arguing that there is no direct infringement because the heating coil is limited to the entrance end of the tube, the Throwsters rely upon the doctrine of file wrapper estoppel. That doctrine applies in those instances where a patent applicant initially files broad claims and, after rejection of those claims by the Patent Office, narrows the claims by amendment to exclude part of the subject matter embraced within the original broad claims. The doctrine provides that if the narrowed claims are granted by the Patent Office, the patentee is estopped to charge direct infringement against devices that fall within the subject matter excluded by amendment. Exhibit Supply Co. v. Ace Patents Corp., 315 U.S. 126, 136–137, 62 S.Ct. 513, 86 L.Ed. 736, 744 (1942); Power Curbers, Inc. v. E. D. Entyre & Co., 298 F.2d 484, 494–495 (4th Cir. 1962).

This doctrine is not applicable to the present case and this is the distinction from and the reason for the separate ruling of November 14, 1973, as to U.S. Patent No. 2,741,893. The requirement of the patent claims that the coil surround the inlet end of the tube was *not* something added by amendment, as the Throwsters assert, but was present in the application and claims as originally filed. See claims 8–10 of the original application (Exhibit No. 950, at 9), all of which require that the "heater coil surrounds the entrance end of said tube". Similarly, rejected claims 15–20 (Exhibit No. 950, at 21–23), although using different verbal formulae, each and all require that the coil surround the entrance end of the tube. Hence, the rejected claims, like the two claims that issued, require that the coil surround at least the inlet portion of the tube. Neither the rejected claims nor the issued claims specified that the coil had to end there. Since the only limitation concerning the position or length of the coil introduced by amendment was that the first terminal be located intermediate the entrance and exit ends of the heater tube, there is no file wrapper estoppel that the first terminal be located at the entrance of the heater tube and that the heating coil wrap around the entire heater tube.

## DIRECT INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS

■ Since the accused heaters used by the Throwsters do not precisely fall within the literal terms of the claims of U.S. Patent No. 3,117,361, these heaters are charged to be substantial equivalents of the invention described in the claims of this patent. Where a device "performs substantially the same function in substantially the same way to obtain the same result" as the patented invention, that device may infringe the patent even if it does not fall within the terms of the claims read literally. Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097, 1102 (1950). In Marvel Specialty Co. v. Bell Hosiery Mills, Inc., 330 F.2d 164, 175 (4th Cir. 1964), cert. den., 379 U.S. 899, 85 S.Ct. 187, 13 L.Ed.2d 175, Circuit Judge Boreman with Circuit Judge (now Chief Judge) Haynsworth and District Judge Barksdale, affirming in part and reversing in part Chief District Judge (now Circuit Judge) Craven, stated:

A protection which extended only to those devices which exactly copy the patented invention would be a hollow and useless safeguard. The essence of the doctrine of equivalents is that one may not pirate another's patent. The test enunciated in the Graver Tank case for determining equivalency is whether the accused device "performs substantially the same function in substantially the same way to obtain the same result". The Supreme Court pointed out that the theory upon which the doctrine of equivalency is founded "is that 'if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape.'" (Footnote omitted).

■ Every patent is entitled to a reasonable range of equivalents consonant with its contribution in advancing the pertinent art, even where its claims were narrowed by amendment in the Patent Office. Tate Engineering, Inc. v. United States, 166 U.S.P.Q. 329, 334 (Ct.Cl.1970), aff'd., 193 Ct.Cl. 1088 (1970).

■ It is a basic tenet of patent law that direct infringement is established if the accused device embodies all the essential elements described in the patent claims. Under the doctrine of equivalents, an accused device does not avoid direct infringement by a transposition of elements, Oxnard Canners, Inc. v.

Bradley, 194 F.2d 655 (9th Cir. 1952), cert. den., 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370; by the substitution of elements, No-Joint Concrete Pipe Co. v. Hanson, 344 F.2d 13 (9th Cir. 1965), cert. den., 382 U.S. 843, 86 S.Ct. 79, 15 L.Ed.2d 83; F. A. Smith Mfg. Co. v. Samson-United Corp., 130 F.2d 525 (2d Cir. 1942), cert. den., 317 U.S. 690, 63 S.Ct. 265, 87 L.Ed. 553; or by the addition of elements, Marston v. J. C. Penney Co., 353 F.2d 976 (4th Cir. 1965), cert. den., 385 U.S. 974, 87 S.Ct. 515, 17 L.Ed.2d 437 (1966).

In *Martson*, supra, 353 F.2d, at 985, the court said:

> One cannot avoid infringement by an addition to a patent even though the addition is important to the use intended for the resulting article. (Citation omitted). To determine whether the accused article infringes Claims 1 and 2 we must look to the words of the claims. If every essential element of the described combination, or its equivalent, is embodied in the chaise sold by Penney, Marston is entitled to prevail. (Citations omitted).

However, direct infringement is avoided by the omission of one or more elements. In Sears, Roebuck & Co. v. Minnesota Mining & Mfg. Co., 243 F.2d 136, 140 (4th Cir. 1957), cert. den., 355 U.S. 932, 78 S.Ct. 413, 2 L.Ed.2d 415 (1958), the court said:

> The facts so far related give substance to the main defense to the suit that the defendants did not infringe the patent because they omit from their production one element or ingredient, to wit, the liquid plasticizer, which is specified in the claims of the patent. It is well established that there is no infringement when this occurs even though the same result is obtained because the accused article is not covered by the claims of the patent. (Citations omitted).

The reason for these rules can be explained by the following example. Suppose a patent, as in this case, has four elements: A, B, C, and D. Direct infringement is *avoided* if an accused device has only elements A, B, and C. Direct infringement is *proved* if an accused device has elements A, C, B, D (transposition); A, B, X, D where X = C (substitution); or A, B, C, D and E (addition). The key to *proving* direct infringement under the doctrine of equivalents is to show that *all* essential elements *or* their equivalents are present in the accused device.

The Throwsters' central argument as to direct infringement under the doctrine of equivalents is that U.S. Patent No. 3,117,361 is not infringed because the patented invention "is limited to a heater having two distinct segments or zones in successive portions of the tube", and that the accused heaters do not infringe this patent because the heating coil surrounds not only the inlet end of the tube but the substantial balance of the tube as well.

Although the patent claims do not specify that the heating coil be confined to the inlet end of the tube, the Throwsters rely upon the illustration and description of but one embodiment of the patented invention wherein the coil surrounds only a portion of the tube and attempts to import this feature as a limitation to the claims. However, the patent itself says (U.S. Patent No. 3,117,361, col. 3, ln. 52 through col. 4, ln. 11):

> Although the invention has been described in detail in respect of a single preferred embodiment, it will be readily understood by those skilled in the art that the invention is capable of many modifications and improvements within the scope and spirit thereof. . . . Accordingly it will be understood that the invention is not to be limited by the specific disclosed embodiment but only by the scope and spirit of the appended claims.

The patent claims require that the heating coil cover at least the portion of the tube adjacent its inlet end. In the accused heaters used by the Throwsters, the heating coil covers the inlet portion of the tube. The Plaintiff contends that the fact that the heating coil extends over the rest of the tube as well is an additional element that is immaterial and therefore the accused devices do not avoid direct infringement.

■ The inventor has testified that the coil can either surround the entire tube or only the inlet portion, and that these are variations of detail within the inventive concept.[5] The Throwsters have produced no evidence to the contrary. Thus, there is a genuine issue of fact existing as to whether the accused devices with two independently regulatable *overlapping* heating systems, one of which employs a heating coil surrounding the *entire* heater tube is an equivalent of the patented invention with two independently *successive* heating systems, one of which employs a heating coil surrounding only the inlet portion of the heater tube. Thus, in making a determination as to direct infringement under the doctrine of equivalents, substance is not be be subordinated to form where doing so will deprive a patent owner of the benefit of the invention or discovery. Up-Right, Inc. v. Safeway Products, Inc., 315 F.2d 23, 27 (5th Cir. 1963), cert. den., 375 U.S. 831, 84 S.Ct. 76, 11 L.Ed.2d 62.

■ Equivalence is a question of fact that can be best determined at trial in light of all of the surrounding circumstances, including the state of the prior art and the purpose and function of each element in the patented invention. "Like any other issue of fact, final determination requires a balancing of credibility, persuasiveness and weight of evidence". Graver Tank & Mfg. Co., supra, 339 U.S., at 609–610, 70 S.Ct., at 857, 94 L.Ed., at 1103; Marvel Specialty Co., supra, 330 F.2d, at 176. Because this inquiry cannot be meaningfully conducted without the aid of expert testimony and other extrinsic evidence, summary judgment on the issue of direct infringement should not be granted where equivalence is an issue. Black, Sivalls & Bryson, Inc. v. National Tank Co., 445 F.2d 922, 927 (10th Cir. 1971); Engineering Development Laboratories v. Radio Corp. of America, 153 F.2d 523, 525 (2d Cir. 1946)(L. Hand, J.); Eaton Paper Corp. v. Hudson Photographic Industries, Inc., 156 U.S.P.Q. 669, 671–672 (S.D.N.Y.1968).

Since there is no file wrapper estoppel, the Plaintiff can rely on the well established doctrine of equivalents in an attempt to prove direct infringement of U.S. Patent No. 3,117,361. This court here expresses no opinion either as to the validity of this patent or as to the contention that the accused devices are actually described by the prior art.

## CONCLUSION

The Throwsters' motion for summary judgment raises factual issues concerning the scope of the patent claims that should be resolved by a jury at the trial of Phase II. Accordingly, the motion for summary judgment is denied.

■ This order, not otherwise appealable because of its interlocutory nature, in the opinion of this court involves a controlling question of law as to which there is substantial ground for difference of opinion, and an immediate appeal from the order may materially advance the ultimate termination of the litigation. This statement is made in accordance with Title 28 U.S.C., Section 1292.

And it is so ordered.

5. Deposition of Henri Crouzet, September 17, 1973, at 24–25, 29, 36–37.

Jan. 14, 1964     H. CROUZET     3,117,361

YARN HEAT TREATMENT APPARATUS

Filed Feb. 11, 1960

**FIG. -1-**

**FIG. -2-**

$220° {}^{+.25°}_{-.75°}$   B

$210° {}^{+5°}_{-5°}$   A

TEMPERATURE

**FIG. -3-**

+5°

210°

−5°

TIME →

220°

+.25°

−.75°

TIME →

**FIG. -4-**

INVENTOR.

HENRI CROUZET

BY

ATTORNEY